[Cite as *In re A.F.*, 2026-Ohio-2998.]

## IN THE OHIO COURT OF APPEALS
### FIFTH APPELLATE DISTRICT
### STARK COUNTY, OHIO

| | |
|---|---|
| IN RE A.F. AND R.F. | Case Nos. 2026CA00046 & 2026CA00047 |
| | <u>Opinion And Judgment Entry</u> |
| | Appeal from the Court of Common Pleas, Juvenile Division, Case Nos. 2023JCV01389 & 2023JCV01390 |
| | Judgment: Affirmed |
| | Date of Judgment Entry: August 3, 2026 |

**BEFORE:** Andrew J. King; Kevin W. Popham; David M. Gormley, Judges

**APPEARANCES:** RICHARD HIXSON, for Appellant - Mother; BRANDON J. WALTENBAUGH, for Appellee - STARK COUNTY JFS

*King, P.J.*

{¶ 1}   S.F., mother of A.F. and R.F., appeals the February 24, 2026 judgment of the Stark County Court of Common Pleas Family Court Division which terminated her parental rights and granted permanent custody of the children to the Stark County Department of Job and Family Services (SCJFS). We affirm the trial court.

### Facts and Procedural History

{¶ 2}   This matter began in September, 2023 when SCJFS received a report that mother was permitting C.P., who is R.F.'s father and A.F.'s uncle as well as a convicted Tier III sex offender, to reside in the home with the children. C.P. was convicted of rape in 2007 and in 2017 was convicted of sexual battery and kidnapping. He had recently been released

from prison when SCJFS became involved. At the time, A.F. was 14-years old and R.F. was seven-years old. SCJFS advised mother that C.P. was to have no unsupervised contact with the children and C.P. was directed to undergo a sex offender risk assessment.

{¶ 3} In November, 2023, SCJFS received another report indicating C.P. was still residing in the home. While he had completed his assessment, C.P. had failed to follow through with recommended treatment and did not believe he needed treatment. C.P.'s evaluation had determined he was well above average risk for recidivism relative to other adult male sex offenders. SCJFS shared the results of the assessment with mother and C.P. along with the assessor's recommendation that C.P. have only professional supervised contact with his daughter, R.F. and no contact at all with his niece, A.F. A.F. is developmentally delayed as was C.P.'s last victim. Mother became angry with the SCJFS caseworker upon hearing these recommendations. Mother refused to talk with the caseworker further and advised the caseworker she was not welcome in her home.

{¶ 4} On December 1, 2023, SCJFS filed a complaint alleging dependency and neglect of A.F. and R.F. and requested protective supervision. SCJFS then amended its complaint on December 7, 2023 and requested temporary custody. An adjudicatory hearing was held on February 15, 2024 wherein mother stipulated to dependency. Neither father appeared. The trial court found the children dependent and ordered them placed in the temporary custody of SCJFS.

{¶ 5} Mother's case plan, in part, required her to complete a parenting evaluation with Lighthouse Counseling, complete parenting classes, and maintain stable housing and employment.

{¶ 6} The trial court regularly reviewed the matter, found SCJFS had made reasonable efforts, and granted one extension of temporary custody.

{¶ 7} On April 24, 2025, SCJFS filed a motion for permanent custody and the matter was set for hearing on July 31, 2025. Mother was granted one continuance which moved the date of the permanent custody hearing to November 5, 2025. A review hearing was held on October 23, 2025. Mother again requested and was granted a continuance. The permanent custody hearing was held on February 2, 2026. Relevant to this appeal, SCJFS presented the following facts.

{¶ 8} Mother started a parenting evaluation with Lighthouse as directed, but then posted Lighthouse testing materials and a recording of her clinical interview on her public Facebook page. The provider indicated mother's insight was very poor and she failed to take any accountability for her actions and her role in the involvement of SCJFS. The Lighthouse provider indicated they were disturbed by mother's behaviors and did not feel safe working with her in the future. After two sessions, Lighthouse terminated their relationship with mother. Mother's caseworker attempted to refer mother to Summit Psychological to complete her parenting assessment, however, they would not provide services to mother until her mental health was stabilized.

{¶ 9} Mother began mental health services with CommQuest on March 26, 2024. She was diagnosed with impulse disorder, cannabis use, depression, and anxiety. The provider was further concerned that mother was experiencing delusions and cognitive distortions. Mother became upset with her first CommQuest counselor as she only wanted to talk about her case with SCJFS. She therefore had to be transferred to a different counselor in May, 2024 which further delayed her treatment.

{¶ 10} While mother did attend counseling, she failed to make any appreciable progress. In September of 2024 she attempted suicide and was hospitalized on an involuntary psychiatric hold. In 2025, mother was charged with telephone harassment and was placed on probation. Mother further threated to blow up the home where her children were staying and threatened bodily harm to and made racial slurs toward her SCJFS case worker and her case worker's supervisor. On social media, mother posted court-related documents and videos which were traumatizing to A.F. when she viewed them, posted personal information about the children's guardian ad litem and her caseworker, and declared her undying support for C.P. Mother continued to support C.P. despite the fact that A.F. disclosed she was sexually assaulted by C.P. and those allegations were substantiated. Mother believed A.F.'s allegations were false. Mother further posted on social media that she was in a relationship with a different man, J.C., who is also a registered sex offender. Mother refused to speak with or cooperate with SCJFS workers on any of these matters. She additionally refused to take any accountability for her role in SCJFS involvement.

{¶ 11} Mother moved several times during the pendency of this matter. Despite numerous requests, mother refused to share her address or a copy of the lease for her last residence with SCJFS. Mother's attorney finally provided the address the week before the permanent custody hearing. The agency was therefore unable to assess mother's home. Mother claimed she was employed, but never submitted pay stubs to the agency.

{¶ 12} The children were initially placed in the same foster home, however, A.F. was removed and placed in a group home due to violent behavior. R.F. remained in the foster home and bonded with her foster family. Both children adapted and did well in their respective placements despite missing mother and wishing to reunite with her.

{¶ 13} The trial court took the matter under advisement and conducted in-camera interviews with both children before rendering a decision. On February 24, 2026, the trial court issued its decision finding the children had been in the temporary custody of SCJFS for 12 or more months of a consecutive 22-month period, that they could not be placed with mother within a reasonable time, and that permanent custody was in the children's best interests.

{¶ 14} Mother filed an appeal and the matter is now before this court for consideration. She raises two assignments of error as follows:

I

{¶ 15} "THE TRIAL COURT ERRED BY FAILING TO APPOINT INDEPENDENT COUNSEL FOR THE MINOR CHILDREN."

II

{¶ 16} "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FINDING THAT PERMANENT CUSTODY WAS IN THE BEST INTEREST OF THE MINOR CHILDREN."

II

{¶ 17} For ease of discussion, we elect to address mother's assignments of error out of order. In her second assignment of error, mother argues the trial court abused its discretion in finding that permanent custody was in the best interests of the minor children. We disagree.

**Applicable Law**

**Standard of Review**

{¶ 18} While mother argues an abuse of discretion standard of review, the Supreme Court of Ohio has explained that the appropriate appellate standard of review of a trial court's

permanent-custody decision is the manifest-weight standard and/or a sufficiency-of-the-evidence standard, depending on the nature of the arguments presented by the parties. *In re Z.C.*, 2023-Ohio-4703, ¶ 11.

{¶ 19} Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.* at ¶13. "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when 'the evidence is legally sufficient to support the jury verdict as a matter of law.' " *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 3, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), quoting Black's at 1433." *Id.*

{¶ 20} On review for manifest weight, the standard in a civil case is identical to the standard in a criminal case: a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury [or finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction [decision] must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 21} In *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), the Supreme Court of Ohio explained the following:

> Weight of the evidence concerns "the inclination of *the greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find *the greater amount of credible evidence* sustains the issue which is to be established before them.

Weight is not a question of mathematics, but depends on its effect in inducing belief." [Emphasis sic.]

{¶ 22} In weighing the evidence, however, we are always mindful of the presumption in favor of the trial court's factual findings. *Eastley v. Volkman*, 2012-Ohio-2179. Additionally, " 'Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *Seasons Coal Co.*, 10 Ohio St.3d 77, 80, (1984), quoting *C.E. Morris Co. v. Foley Construction Co.*, 54 Ohio St.2d 279, 280-281 (1978).

{¶ 23} Mother appears to frame her arguments as manifest weight arguments as she argues her evidence was more persuasive than that presented by SCJFS.

## Permanent Custody

{¶ 24} R.C. 2151.414(B)(1) states in relevant part that permanent custody may be granted to a public or private agency if the trial court determines by clear and convincing evidence at a hearing held pursuant to division (A) of R.C. 2151.414, that it is in the best interest of the child and any of the following apply:

> ... (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in

division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

{¶ 25} R.C. 2151.414(B) therefore provides a two-pronged analysis the trial court is required to apply when ruling on a motion for permanent custody. In practice, the trial court will determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1) (a) through (d) is present before proceeding to a determination regarding the best interest of the child.

### Best Interests

{¶ 26} R.C. 2151.414(D) governs "best interests" and states:

(D) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period ending on or after March 18, 1999;

(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

## Mother's Arguments

### Temporary Custody for at Least 12 out of a Consecutive 22-month Period

{¶ 27} As an initial matter, we note that mother does not challenge the trial court's R.C. 2151.414(B)(1) findings and acknowledges that at the time of the permanent custody hearing, the children had been in the temporary custody of SCJFS for two years. The "12 of 22" provisions contained in R.C. 2151.413(D)(1) and R.C. 2151.414(B)(1)(d) balance the importance of reuniting a child with the child's parents against the importance of a speedy resolution of the custody of a child. *In re C.W.*, 2004-Ohio-6411, ¶22. Through the "12 of 22" provisions in the permanent-custody statutes, the legislature provides parents with 12 months to work toward reunification before an agency can institute a permanent-custody action asserting R.C. 2151.414(B)(1)(d) grounds. *Id*. This court has adopted the position that proof of temporary custody with an agency for twelve or more months of a consecutive twenty-two-month period, standing alone, is sufficient to award permanent custody. *In the Matter of A.S., V.S., and Z.S.*, 2013-Ohio-4018 (5th Dist.). Therefore,

a finding that grounds existed for permanent custody cannot be against the manifest weight of the evidence. *Matter of L.G.,* 2021-Ohio-743, ¶ 36 (5th Dist.).

{¶ 28} Nonetheless, we examine mother's arguments as to the trial court's best interests findings. Mother argues the children's best interest were best served by either reunification with her or a kinship placement in order to maintain the familial bond between mother and the children. We find there was competent, credible evidence to support the trial court's decision and it is not against the manifest weight of the evidence.

{¶ 29} We first note there were no motions before the trial court for a change of legal custody at the time of the permanent custody hearing. SCJFS had, however, explored several potential placements.

{¶ 30} A home study was conducted with mother's sister, M.S., however, M.S. made threats to harm SCJFS staff and had a criminal charge for threatening to kill another individual. The placement was therefore denied due to best interests concerns.

{¶ 31} A home study was also conducted with mother's uncle, A.F., but A.F. did not understand the level of care the children required due to their mental and emotional challenges and severe behavioral issues. Both children are diagnosed ADHD and A.F. is autistic. Transcript of trial (T.) at 115-116, 126, 140. Uncle denied that the children had any issues at all. T. 148. The longest he had cared for the children was "a day or two" when they "were little." T. 146. Moreover, uncle required daily assistance from his daughter, H.T. due to his own health challenges. T. 151. The SCJFS kinship coordinator did not have confidence in uncle's ability to care for the children independently. T. 141. Moreover, while H.T. stated she would be willing to help with the children she lived with C.B. the father of her youngest children. C.B. has two allegations of sex abuse, one in Wayne County and one against H.T.'s

daughter. H.T. did not believe her daughter's accusation. T. 141-142. While H.T. stated she would keep the children separated from C.B., the kinship coordinator did not believe that was a realistic long-term possibility. T.142-143. Placement with uncle was therefore denied as not being in the best interests of the children. T. 116.

{¶ 32} Mother also provided the name of a relative in Florida for potential kinship placement, but that person failed to return the call from SCJFS before the permanent custody hearing. One set of grandparents expressed interest and were approved for a home study, but then were only interested in taking placement of R.F. SCJFS aimed to keep the siblings together if possible. T. 116-117.

{¶ 33} R.F.'s father, C.P., is a Tier II sex offender. C.P. relinquished custody of R.F. and stipulated to a grant of permanent custody to SCJFS. T. 6-11. A.F.'s father is incarcerated on a parole violation for a sex offense and is also a registered sex offender. He did not participate in the permanent custody proceedings. T. 5.

{¶ 34} The record therefore reflects there were no appropriate or available kinship placements for the children. Accordingly, the trial court did not lose its way in failing to place the children with a family member.

{¶ 35} As for reunification with mother, the record also reflects reunification is not in the children's best interests. While mother argues she substantially complied with her case plan, the record belies that claim. As outlined in our statement of facts, mother was uncooperative with SCJFS, refused to take accountability for the removal of the children, and her mental stability remained questionable. T. 29-40. Mother has a full-scale IQ of 75 which indicates her judgment is challenged and she would need assistance with parenting. T. 71. While mother claimed C.P. was no longer permitted in her home, mother's caseworker did

not believe mother would protect the children from C.P. as she had failed to change her behaviors during the life of the case, and as recently as three months before the permanent custody hearing had stated she did not see anything wrong with C.P. and believed he can be a changed person. This was shortly after the allegations from A.F. were substantiated. T. 39-40.

{¶ 36} The children were initially placed in the same foster home, but then A.F. violently attacked her foster mother and was placed in a group home. Mother was proud of A.F. for acting out violently and encouraged both children to continue such behaviors. Guardian ad Litem report, July 24, 2025.

{¶ 37} Given the foregoing, at the time of the complaint for permanent custody mother had failed in large part to remedy the concerns that led to the initial removal of the children. We find the trial court carefully weighed the evidence and did not lose its way in finding A.F. and R.F. cannot and should not be placed with mother within a reasonable time, the children have been in the temporary custody of SCJFS for over twelve months of a 22-month-period, and that permanent custody of A.F., and R.F. to SCJFS is in their best interests.

{¶ 38} The second assignment of error is overruled.

II

{¶ 39} In her first assignment of error, mother argues the trial court erred in failing to appoint independent counsel for the children. We disagree.

{¶ 40} As noted by SCJFS, mother never raised this issue in the trial court. She has therefore forfeited all but plain error. In *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997) at syllabus, the Supreme Court of Ohio stated "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional

circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." The *Goldfuss* Court further explained "The plain error doctrine originated as a criminal law concept. In applying the doctrine of plain error in a civil case, reviewing courts must proceed with the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings." *Id*. at 121.

{¶ 41} The burden is upon Mother to demonstrate plain error and she has failed to raise or argue plain error. Mother points to the children's repeated desire to reunify with her as evidence that they should have been appointed counsel. However, the trial court was well aware of the wishes of the children via reports filed by the GAL, the testimony of the SCJFS caseworker, and the trial court's own interviews with the children. Judgment Entry, February 24, 2026 at 1. Mother fails to explain how the appointment of counsel for the children would have changed the outcome in this matter. A child's desire to reunify with a parent is but one consideration of many in determining the best interests of the child. In the instant matter, we find no error, plain or otherwise, in the trial court's failure to appoint counsel for the children.

{¶ 42} The first assignment of error is overruled.

{¶ 43} The judgment of the Stark County Court of Common Pleas Juvenile Division is affirmed. Costs to Appellant.

By: King, P. J.

Popham, J. and

Gormley, J. concur.